FILED

SEP 2 3 2010
SEP 23 2010
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **NEAL TOKOWITZ** | ) | 1:10-cv-06094 |
| **Plaintiff,** | ) | C: Judge William Hibbler |
| | ) | Magistrate Judge Sidney I. Schenkier |
| **vs.** | ) | |
| **COOK COUNTY SHERIFF'S OFFICE,** | ) | **JURY TRIAL DEMANDED** |
| **Defendant.** | ) | |

## COMPLAINT

Neal Tokowitz ("Plaintiff" or "Tokowitz"), state for his complaint against the Cook County Sheriff's Office ("Defendant" or "Sheriff's Office" or "Department") as follows:

## INTRODUCTION

1. Lieutenant Colonel Neal E. Tokowitz served the Cook County Sheriff's Department with distinction for twenty years, primarily working in the Internal Affairs Division. Throughout his tenure, his performance was unquestionably excellent, as demonstrated by his multiple promotions and performance reviews. However, Mr. Tokowitz was subject to a multi-year campaign of harassment and retaliation due to his efforts to enforce rules and end sexual harassment within the Department. While he admirably held on as long as he could, he ultimately reached his breaking point and was constructively discharged. Now he brings this action against the Cook County Sheriff's Office, his former employer, seeking a declaratory judgment (pursuant to Federal Rule of Civil Procedure 57), damages and injunctive relief for the Sheriff's Office's unlawful discriminatory treatment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, ("Title VII").

## THE PARTIES

2. Plaintiff Tokowitz is a citizen of the State of Illinois.

3. Plaintiff was employed by Defendant Cook County Sheriff's Office in numerous Illinois offices from August 1988 until September 2008.

4. Defendant Cook County Sheriff's Office is a home rule unit of local government pursuant to Article VII § 6(a) of the Illinois Constitution.

## JURISDICTION AND VENUE

5. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., ("Title VII").

6. Plaintiff timely filed a Charge of Discrimination with both the U.S. Equal Employment Opportunity Commission ("EEOC") and the Illinois Human Rights Commission against Defendant Cook County on or about May 11, 2009 (EEOC No. 440-2009-04555), within 300 days of the commission of the unfair employment practice. A true and accurate copy of the Charge is attached hereto as Exhibit A.

7. Jurisdiction is invoked pursuant to 28 U.S.C. § 1343(4) and 42 U.S.C. § 2000e-5(f). A right-to-sue letter was issued by the EEOC on June 28, 2010, a true and accurate copy of which is attached hereto as Exhibit B.

8. This action properly lies in the Northern District of Illinois, Eastern Division, pursuant to 29 U.S.C. § 1391(b), in that Plaintiff performed his employment duties almost exclusively within the State of Illinois; the claim arose in this judicial district; and most, if not all, of the relevant witnesses are located in Illinois.

## FACTS

### Tokowitz is Hired by Cook County and Excels

9. Mr. Tokowitz began working in the Cook County Sheriff's Office as the Chief of Real Estate, Levy, Replevin and Eviction on August 1, 1988. Over the next two decades, he was a stellar employee, only leaving for a few months in 1989 when he resigned in order to apply for a different job with the Defendant.

10. Mr. Tokowitz always met or exceeded performance expectations. In 20 years of employment, he never received a negative performance review and he consistently received promotions.

11. In 2002, Tokowitz was promoted to Deputy Chief of the Sheriff's Work Alternative Program (SWAP). He remained a Deputy Chief until he was constructively discharged on September 30, 2008.

12. By all accounts, Mr. Tokowitz excelled in every aspect of his work. However, it seems that some members of the Department who consistently broke departmental rules and state laws did not appreciate the diligence with which Mr. Tokowitz performed his duties. As a result, they engaged in a multi-year campaign of harassment and retaliation that ultimately drove Mr. Tokowitz to resign.

**Neal Tokowitz**

17. In 1992, the Department created the Department of Community Supervision and Intervention ("DCSI") to address problems related to jail overcrowding. Mr. Tokowitz successfully wrote two grants to get the Sherriff's Work Alternative Program hundreds of thousands of dollars. Naturally, Mr. Tokowitz was then selected to administer the grants.

18. Just as Mr. Tokowitz was experiencing the first of his many impressive accomplishments, he also saw the underside of the Department, one where rules were routinely flouted and personal relationships trumped competence.

19. Mr. Tokowitz's next assignment was to a sub-unit of DCSI called "Day Reporting" in which he was assigned to write the Investigation's Order that would establish the rules of conduct and disciplinary procedures to be enforced by Internal Affairs. The Order was approved and implemented, yet he was not even considered for the role of IAD Director.

20. Moreover, despite having, upon information and belief, higher test scores than most people who had recently sat for the first Sergeants Merit examination, when the list of people who passed came out, Mr. Tokowitz was mysteriously not on it, thereby denying him yet another opportunity.

21. Mr. Tokowitz was eventually hired as the assistant to the Director of the Internal Affairs Division ("IAD"), a position at which he excelled, performing duties such as creating an internal training program for DCSI personnel and writing most of the lesson plans.

22. At the time, Mr. Tokowitz was working at pay grade 12 even though he was supposed to be, based on his position, a pay grade 16. He asked about it, but was always told it would be in the next budget. Even when he was promoted to Deputy Director of IAD, he was not given a corresponding pay raise. Upon information and belief, all other Deputy Directors were at a pay grade from 22 to 24.

23. On or around ~~**WHEN**~~? 1995, Mr. Tokowitz requested the opportunity to take the Supervisor's Course at Northwestern University. Upon information and belief, he was the only Cook County employee to take the class or even express any interest in taking it.

24. Mr. Tokowitz earned an A in the class and upon his return to work, he drafted a Supervisor's Manual and began teaching the material to supervisors.

25. At some time in 1995 or 1996, it came to Mr. Tokowitz's attention through his role in Internal Affairs that an officer named Marcy Damen was sexually harassing male and

female coworkers ([redacted]?). At around the same time, Bill Wallace became the Director of IAD. Mr. Wallace is currently the Executive Director of DCSI.

26. At the end of Mr. Tokowitz's investigation, he and Mr. Wallace recommended that a complaint file be opened against Chief Denis Micnerski who was complicit in Ms. Damen's harassment.

27. Rather than be lauded for his thorough work, Mr. Tokowitz and Mr. Wallace were harshly reprimanded by Jim Ryan, a new attorney who was the Operations Manager for the Department and the Sheriff's nephew. Although the proper course was to take the recommendation of IAD to the Inspector General's office, Mr. Ryan ended the investigation immediately.

28. Around the same time, Mr. Tokowitz was downgraded from Deputy Director to Investigator, though he remained at Pay Grade 12, which was lower than either position was for others at the same level.

29. Shortly thereafter, a civilian filed a criminal complaint against Officer Damen alleging battery and sexual harassment. The investigation was restarted, the same conclusions reached, and when Mr. Ryan began taking steps to once again end the investigation, Mr. Tokowitz made clear that he would tell the truth if called to testify, including details about Mr. Ryan killing the initial investigation.

30. Two weeks later, Mr. Wallace called Mr. Tokowitz into the office and pressured him not to follow up on his threat to expose Mr. Ryan. [redacted]?

31. In August 1998, Mr. Tokowitz was promoted to Deputy Chief of SWAP and was instructed to get control of the various administrative and supervisory problems. Despite the promotion, there was no pay raise. [redacted] However, the person who replaced Mr.

Tokowitz as Investigator was installed at Pay Grade 16, a full four levels higher than where Mr. Tokowitz had been for years.

32. Mr. Tokowitz's first assignment, which came from Deputy Executive Director Wallace, was to rewrite and/or create new General Orders for SWAP. Of course, Mr. Tokowitz had written the last set of orders years before. So effectively he was being asked to redo work that he had already done.

33. When Mr. Tokowitz arrived at his new office in Maywood, Illinois, he discovered that SWAP Director Ray Doran had no idea he was coming and had no assignment for him. Rather than accommodate Mr. Tokowitz, he was assigned to work at desk in the hallway that was not only humiliating, but also made it impossible for him to work on his confidential files.

34. When Mr. Tokowitz asked for an office, he was told there were none available, something that was demonstrably untrue. It was clear that Mr. Tokowitz was being punished for having the nerve to do his job properly, which included investigating charges of sexual harassment and recommending punishment when appropriate.

35. Even after getting an office that had previously been used for storage, Mr. Tokowitz was given no new assignments. Instead, he continued working on new General Orders. When he finished those, he turned them in and received no feedback.

36. In or around 2001, most of SWAP including Mr. Tokowitz moved into new offices. While he finally had an office on par with his peers, Mr. Tokowitz was still not given much work to do, and was given no assignments of significance. He constantly asked for assignments, but was consistently refused. He continued to try to find out his pay grade, but all he was told was that all Deputy Chiefs were Pay Grade 18. That said, Mr. Tokowitz clearly was not being paid at that level.

37. When Mr. Tokowitz was finally given an assignment of some substance, filling in as an instructor at the academy, he leapt at the chance and did an excellent job. However, after teaching several weeks, he was told he was not going to be asked back because he had given a couple of students C's. Once again, for simply enforcing rules and maintaining standards, Mr. Tokowitz was retaliated against.

38. Mr. Tokowitz was then given the chance to teach at a continuing education academy for officers, which he did twice a week and did well.

39. Around the same time, Mr. Wallace asked Mr. Tokowitz to find a way to get twelve additional vehicles for DCSI. Mr. Tokowitz went far above and beyond and identified a deal that would actually get the department several dozen cars, vans and busses. Inexplicably, Mr. Wallace refused to approve the deal and refused to offer a reason. It soon became clear that the reason the deal was so good was because Mr. Tokowitz's plan would have avoided all of the wasted funds that normally went to friends and supporters of the departmental higher ups who had a financial interest in the auto business.

40. Still with no assignments at his office no matter how much he requested them, Mr. Tokowitz taught two days a week and worked essentially as a clerk at Traffic Court, assignments that were well below what other Deputy Chiefs had.

41. Training Director O'Sullivan, who did not work in Mr. Tokowitz's office, then gave Mr. Tokowitz two assignments. First, he asked Mr. Tokowitz to update the way firearms training records were stored. Second, he wanted Mr. Tokowitz to take over as the DCSI Training Director. Mr. Tokowitz said he would like the new position and Mr. O'Sullivan said once he finished the project on the training records, the training job would be his.

42. Mr. Tokowitz immediately threw himself into the first assignment. However, just a couple of weeks later, he received a memo from the new DCSI Training Director, the position that had been promised by Mr. O'Sullivan.

43. In late summer of 1999, following another long period of being virtually ignored by his superiors in his office. Mr. Tokowitz was asked by Kevin Phillips, the Director the Sheriff's Emergency Management Agency, asked Mr. Tokowitz to write a grant application. Despite only having a couple of weeks before the deadline, Mr. Tokowitz was able to get everything done with no supervision and the office got a $300,000 grant.

44. Rather than being praised for his accomplishment and given more responsibility as would be appropriate for someone of Mr. Tokowitz's level, things soon actually got worse for him. An anonymous complaint was filed against him, purportedly by one of his students. He was found guilty of disclosing confidential information and promptly appealed as the allegations were not only untrue, but actually in violation of departmental rules.

45. His superiors then actually instructed Mr. Tokowitz to drop his appeal, which he of course refused to do. The appeals board then rules the investigation was invalid. Rather than let things go, the Inspector General arranged for Mr. Tokowitz to be "randomly" drug tested five times in the next four weeks, all of which Mr. Tokowitz passed.

46. Not long after that, Henry Barsch, IAD Director of the Department of Corrections called Mr. Tokowitz to demand why he told officers "all those things" in class. When he explained what "all those things" were, Mr. Tokowitz made clear that that was the law. Next thing he knew, Mr. Tokowitz was told not to return to class. Mr. Tokowitz was never allowed to teach or write training or study materials again.

47. Once again, Mr. Tokowitz was being punished for simply doing his job and doing it well.

IN APPROXIMATELY AUG, 2001

48. [redacted], Mr. Wallace asked Mr. Tokowitz to undertake a "special" and "sensitive" investigation, to look into allegations against Gordon Kalb, the Field Chief of SWAP. After being assured by Mr. Wallace and IAD Director Healy that neither he nor any of his informants would be punished for helping in the investigation of someone as powerful as Chief Kalb, Mr. Tokowitz agreed to lead the inquiry.

49. Mr. Tokowitz spent more than two months on the investigation, which included interviews with more than 40 witnesses. What he discovered was truly shocking: the evidence clearly showed that Chief Kalb had engaged in a multi-year pattern of massive sexual harassment and discrimination among other illegal behaviors and had no fear of punishment.

50. Additionally, numerous male supervisors who worked under Kalb also engaged in a pattern of sexual harassment, something their boss had allowed them to do without fear of any sort of repercussions.

51. At one point in the course of the investigation, Director Doran actually tried to intercede and stop Mr. Tokowitz from talking to a witness [redacted] When Mr. Tokowitz was finally able to conduct that interview, he found that she was another officer [redacted] who would confirm that she had been sexually harassed by Chief Kalb.

52. At the end of the investigation, Mr. Tokowitz submitted a report that concluded Chief Kalb had engaged in a pattern of illegal sexual harassment and discrimination.

53. When Mr. Tokowitz submitted his report, he included a statement that he would consider any retaliation, especially if his duties were changed to clerical, to be a violation of the Whistleblower's Act.

54. Mr. Tokowitz was assigned to help out one day a week in the Maywood office doing intake work. Not long thereafter, Chief Gordon Kalb showed up and declared loudly and in public that Mr. Tokowitz was being assigned to intake duties, a clerical assignment far below his rank.

55. Making matters worse, Chief Kalb declared that Mr. Tokowitz was now to report directly to Chief Kalb.

56. Mr. Tokowitz then met with Mr. Wallace and demanded this violation of the Whistleblower's Act be fixed. When Mr. Tokowitz returned to his office, Chief [redacted] George Tamez offered Mr. Tokowitz the chance to return to duty on the street, something Mr. Tokowitz had wanted for years. Even when Chief Tamez explained that the only way it was possible would be if Mr. Tokowitz was willing to return to wearing a uniform, downgrade from an unmarked car to a squad car, and work most weekends and on an unpredictable schedule. Despite all of the effective demotions, Mr. Tokowitz agreed to the terms.

57. In Mr. Tokowitz's new office in Skokie, he continued to go above and beyond what was demanded of him. There were rules all officers had to follow and he took them seriously.

58. Mr. Tokowitz, the highest ranking individual in uniform in Skokie, attempted to enforce the rules. Yet every single time he wrote someone up, his superiors ignored him.

59. Moreover, Mr. Tokowitz's offers to teach classes to the officers in the district went unanswered. When he went ahead and taught lessons as opportunities arose, his superiors barely acknowledged his efforts, if at all. He was certainly never rewarded for it.

60. Eventually, Chief Tamez actually told Mr. Tokowitz to stop going to the other districts. In other words, Chief Tamez instructed Mr. Tokowitz to stop doing his job.

61. As time went on, so did the continuous shots at Mr. Tokowitz. For example, when Mr. Tokowitz was finally assigned a new car befitting a Deputy Chief, he was almost immediately publicly instructed to give up the car so that a lower ranking officer could have it.

62. Still determined to make things work, Mr. Tokowitz continued to do his job and do it well. He soon discovered that Sergeant JAMES ~~FIRST NAME~~? Righeimer was grossly negligent in his duties. Mr. Tokowitz told Chief Tamez he was filing a complaint against Sergeant Righeimer and his supervisor, Lieutenant JASON ~~FIRST NAME~~? Norton, who had allowed Righeimer's behavior. Chief Tamez instructed Mr. Tokowitz not to investigate the Lieutenant and Mr. Tokowitz acquiesced.

63. Mr. Tokowitz did investigate Sergeant Righeimer and found out that he was even worse than thought. Mr. Tokowitz filed a complaint letter, but rather than be punished, Sergeant Righeimer was actually rewarded with a plush new assignment in headquarters.

64. Still, Mr. Tokowitz persisted in doing his job and doing it well. He published a memo on a disaster drill, which was promptly ignored. He went to a seminar put on by the federal government and subsequently made suggestions and requests, all of which were ignored. He made formal complaints, wrote training documents, and did roll call training, all of which were part of his duties and all of which were ignored.

65. In December 2003, Mr. Tokowitz was injured in the course of his duties. While he was out, he was virtually ignored as the Department seemingly went out of its way to make things difficult for him.

66. When he returned to work in August, things only got worse. First, Mr. Tokowitz was told he would not have a car, something unheard of for someone of his rank. Second, he learned that his ID card had been destroyed, so he could not work until he got a new one. He did

everything he had to do to get the new ID, yet no card came. He was told that was because the machine that makes the cards was broken, but other people somehow were managing to get cards from the "broken" machine.

67. Finally, Mr. Tokowitz discovered that, in fact, his credentials had been in the office of the DCSI Training Chief. When Mr. Tokowitz inquired, Chief Tamez claimed there were "administrative problems" standing in the way. Chief Tamez continued to come up with excuses to stop Mr. Tokowitz from getting his ID until the middle of October, a full two months after he had returned to work.

68. Upon information and belief, the refusal to give Mr. Tokowitz his ID card was part of a calculated effort to embarrass him as it effectively prohibited him from doing his job.

69. Even with the new ID card, the retaliation against Mr. Tokowitz continued. He was removed from street duty against his wishes and reassigned to the office in Maywood.

**The Retaliation Towards Mr. Tokowitz Escalates**

70. Once Mr. Tokowitz arrived in Maywood, things went from bad to worse as he was singled out for mistreatment and effectively treated as the office joke by superiors and subordinates.

71. He was assigned to a desk that did not even have a word processor. And when he finally was given a word processor, it was not hooked up to the office network.

72. He was the only person at his level who was prohibited from working for seven and a half hours and effectively taking his lunch break at the end of the shift.

73. He made numerous suggestions and constructive criticisms, all of which were completely ignored.

74. His superiors had a screen put up in front of his desk, effectively isolating him from the rest of the office.

75. He was never allowed to work overtime, despite numerous requests by him to do so.

76. In other words, the Defendant treated Mr. Tokowitz precisely as he said he would consider to be retaliation following his submitting a report accusing Chief Kalb of sexual harassment.

77. Mr. Tokowitz held on as long as he could, eager to do his job, but with no end to the retaliatory treatment in sight, he finally reached his breaking point and was constructively discharged on September 30, 2008.

## CAUSE OF ACTION

### Count I: Defendant's Violation of Title VII of the Civil Rights Act of 1964

78. Plaintiff hereby incorporates by reference, as though restated, each of the factual allegations in paragraphs 1 through 76 above as paragraph 77.

79. Defendant is an employer within the meaning of 42 U.S.C. §2000e-5, in that it engages in an industry affecting commerce, and, upon information and belief, it employs more than 150 regular employees.

80. At all times material hereto, Plaintiff performed at or above Defendant's legitimate expectations.

81. 42 U.S.C. §2000e-3(a) prohibits retaliation against employees for assisting or participating "in any manner" in an investigation into behavior prohibited by Title VII.

82. As a result of this discriminatory conduct, Plaintiff suffered damages, including but not limited to:

a. loss of income;

b. loss of benefits;

c. loss of professional opportunities and future income;

d. emotional distress; and

e. damage to his professional reputation.

**WHEREFORE** Plaintiff respectfully requests the following relief:

A. An award of damages for back pay, front pay, and other equitable relief;

B. An award of compensatory damages in an amount to be proven at trial but in any event, in excess of $75,000.00;

D. An award to Plaintiff for reasonable attorneys' fees and costs; and

E. All other relief this Court deems just.

Respectfully submitted,

**Dated:** September 23, 2010

NEAL TOKOWITZ

Ruth I. Major (#6205049)
Laura M. Rawski (#6300636)
The Law Offices of Ruth I. Major, PC
225 W. Washington Street, Suite 2200
Chicago, IL 60606
Phone: (312) 893-7544
Firm No. 45037

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974: See Privacy act statement before completing this form.

Illinois Department of Human Rights and EEOC
*State or local Agency, if any*

AGENCY
[ ] FEPA
[X] EEOC

**CHARGE NUMBER**

| | | |
|---|---|---|
| NAME *(Indicate Mr., Ms., Mrs.)* Neal Tokowitz | | HOME TELEPHONE *(Include Area Code)* (847) 933-0073 |
| STREET ADDRESS 4833 W. Pratt Ave. | CITY, STATE AND ZIP CODE Lincolnwood, IL 60712 | DATE OF BIRTH 04/22/1943 |
| NAME Cook County Sheriff's Office | NUMBER OF EMPLOYEES, MEMBERS +15 | TELEPHONE *(Include Area Code)*: (312) 603-6444 |
| STREET ADDRESS 50 W. Washington | CITY, STATE AND ZIP CODE Chicago, IL 60602 | COUNTY Cook |
| NAME | NUMBER OF EMPLOYEES, MEMBERS: | TELEPHONE *(Include Area Code)* |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box (es)*

[ ] RACE [ ] COLOR [ ] SEX [ ] RELIGION [ ] NATIONAL ORIGIN

[X] RETALIATION [ ] AGE [ ] DISABILITY [ ] OTHER Pregnancy Act

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA) LATEST (ALL)

[X] CONTINUING ACTION

THE PARTICULARS ARE *(if additional space is needed, attach extra sheet(s)*

See attached.

RECEIVED EEOC
MAY 11 2009
CHICAGO DISTRICT OFFICE

"OFFICIAL SEAL"
Tammy A. Manis
Notary Public, State of Illinois
My Commission Exp 07/17/2010

[x] I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone Number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 5/5/09 Charging Party: [signature]

State of Illinois
County of Cook:

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

[signature]
SIGNATURE OF COMPLAINANT DATE

Sworn to and subscribed to before the undersigned notary public in and for said jurisdiction this 5 day of May, 2009

My commission expires 07-17-10

Tammy A. Manis
Notary Public

EXHIBIT A

## Charge of Discrimination of Neal Tokowitz

I. I was employed by the Cook County Sherriff's Office from August 1st, 1988 through September 30th, 2008.

II. I was singled out and treated as *persona non grata* after I began reporting illegal activity, mostly involving sexual harassment of several female officers. Due to bringing this to the attention of my superiors, I was given a desk in the hallway without a computer or adequate supplies necessary for my job while clerks who were subordinate to me were given offices and the materials they required. Furthermore, I was stripped of my authority for all intents and purposes, not included in meetings attended by all other employees in my same position, and told on several occasions to stop writing grants (which I had successfully done for the Sheriff's Office on numerous prior occasions) for no legitimate reason.

III. Specifically, and by way of example and not intended as an exhaustive list, I reported: various claims of sexual harassment and illegal orders against Chief Gordon Kalb; observation of a female officer being asked to "give a blow job" in front of a group of male officers; and claims of physical abuse of young officers by their superiors.

IV. I actively and enthusiastically served the Sheriff's Office for 20 years, without a review stating anything less than "meets" or "exceeds" the standard of performance. In return for my hard work and willingness to stand up and protect my fellow officers and the integrity of the Office, as my record shows, I was publicly humiliated and pushed to the mental breaking point during my final years of service.

V. Throughout my tenure with the Sherriff's Office I remained a grade 12 despite being told I was promoted to a grade 16 and later a grade 18. My salary during that time ranged between approximately $34,000 and $47,000 while the stated salary for grade 16 and 18 positions was

significantly higher. I estimate that my salary would be approximately $8,000 higher per year had I been paid correctly.

VI. I believe that the disparity in my salary, and the adverse treatment I received on the job, were the direct result of my reporting of numerous violations of state and federal laws.

**Charge of Discrimination of Neal Tokowitz**

I. I was employed by the Cook County Sherriff's Office from August 1st, 1988 through September 30th, 2008.

II. I was singled out and treated as *persona non grata* after I began reporting illegal activity, mostly involving sexual harassment of several female officers. Due to bringing this to the attention of my superiors, I was given a desk in the hallway without a computer or adequate supplies necessary for my job while clerks who were subordinate to me were given offices and the materials they required. Furthermore, I was stripped of my authority for all intents and purposes, not included in meetings attended by all other employees in my same position, and told on several occasions to stop writing grants (which I had successfully done for the Sheriff's Office on numerous prior occasions) for no legitimate reason.

III. Specifically, and by way of example and not intended as an exhaustive list, I reported: various claims of sexual harassment and illegal orders against Chief Gordon Kalb; observation of a female officer being asked to "give a blow job" in front of a group of male officers; and claims of physical abuse of young officers by their superiors.

IV. I actively and enthusiastically served the Sheriff's Office for 20 years, without a review stating anything less than "meets" or "exceeds" the standard of performance. In return for my hard work and willingness to stand up and protect my fellow officers and the integrity of the Office, as my record shows, I was publicly humiliated and pushed to the mental breaking point during my final years of service.

V. Throughout my tenure with the Sherriff's Office I remained a grade 12 despite being told I was promoted to a grade 16 and later a grade 18. My salary during that time ranged between approximately $34,000 and $47,000 while the stated salary for grade 16 and 18 positions was

significantly higher. I estimate that my salary would be approximately $8,000 higher per year had I been paid correctly.

VI. I believe that the disparity in my salary, and the adverse treatment I received on the job, were the direct result of my reporting of numerous violations of state and federal laws.

EEOC Form 161 (11/09)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# DISMISSAL AND NOTICE OF RIGHTS

To: **Neal Tokowitz**
**4833 W. Pratt Ave.**
**Lincolnwood, IL 60712**

From: **Chicago District Office**
**500 West Madison St**
**Suite 2000**
**Chicago, IL 60661**

**CERTIFIED MAIL 7010 0780 0001 7853 4289** CP

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 440-2009-04555 | Vittoria Incandela, Investigator | (312) 886-9838 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

John P. Rowe

**John P. Rowe,**
**District Director**

6/28/10
*(Date Mailed)*

Enclosures(s)

cc: COOK COUNTY SHERIFF'S OFFICE

EXHIBIT B