## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Neal Tokowitz,                              )
                                     )
                Plaintiff,                   )
                                     )
              v.                            )     No. 10 C 6094
                                     )
Cook County Sheriff's Office,               )     Honorable Judge William Hibbler
                                     )
               Defendant.                   )

## FIRST AMENDED COMPLAINT

The Plaintiff, Neal Tokowitz, by and through his attorneys, Ziccardi Law Offices, for his

First Amended Complaint against the Defendant, Cook County Sheriff's Office, states as

follows:

## INTRODUCTION

1.        Lieutenant Colonel Neal E. Tokowitz served in the Cook County Sheriff's

Department with distinction for twenty years, primarily working in the Internal Affairs Division.

Throughout his tenure, his performance was unquestionably excellent, as demonstrated by his

multiple promotions and performance reviews. However Mr. Tokowitz was subject a multi-year

campaign of harassment and retaliation due to his efforts to enforce rules, end sexual harassment

within the Department and seek pay commensurate with his pay grade and position. While he

admirably held on as long as he could, he ultimately reached his breaking point and was

constructively discharged. Now he brings this action against the Cook County Sheriff's Office,

his former employer, seeking damages and injunctive relief for the Sheriff's Office's unlawful

discriminatory treatment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§2000e *et seq.*, ("Title VII"), as well as damages arising from the defendant's breach of its contractual obligations to him.

## THE PARTIES

2.     Plaintiff Tokowitz is a citizen of the State of Illinois.

3.     Plaintiff was employed by Defendant Cook County Sheriff's Office in numerous Illinois Offices from August 1988 until September 2008.

4.     Defendant Cook County Sheriff's Office is a home rule unit of local government pursuant to Article VII §6(a) of the Illinois Constitution.

## JURISDICTION AND VENUE

5.     This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, ("Title VII").

6.     Plaintiff timely filed a Charge of Discrimination with both the U.S. Equal Employment Opportunity Commission ("EEOC") and the Illinois Human Rights Commission against Defendant Cook County on or about May 11, 2009 (EEOC No. 440-2009-04555), within 300 days of the commission of the unfair employment practice. A true and accurate copy of the Charge is attached hereto as Exhibit A.

7.     Jurisdiction is invoked pursuant to 28 U.S.C. §1343(4) and 42 U.S.C. §2000e-5(f). A right-to-sue letter was issued by the EEOC on June 28, 2010, a true and accurate copy of which is attached hereto as Exhibit B.

8.     This action properly lies in the Northern District of Illinois, Eastern Division, pursuant to 29 U.S.C. §1392(b), in that Plaintiff performed his employment duties almost exclusively within the State of Illinois; the claim arose in this judicial district; and most, if not all, of the relevant witnesses are located in Illinois.

## FACTS

### Tokowitz is Hired by Cook County and Excels

9.      Tokowitz began working in the Cook County Sheriff's Office as the Chief of Real Estate, Levy, Replevin, and Eviction on August 1, 1988. Over the next two decades, he was a stellar employee, only leaving for a few months in 1989 when he resigned in order to apply for a different job with the Defendant.

10.     While employed by the Sheriff's Office, Tokowitz always met or exceeded performance expectations. In twenty years of employment with defendant, he never received a negative performance review and he consistently received promotions.

11.     In 2002, Tokowitz was promoted to Deputy Chief of the Sheriff's Work Alternative Program (SWAP). He remained a Deputy Chief until he was constructively discharged on September 30, 2008.

12.     By all accounts, Tokowitz excelled in every aspect of his work. However, some members of the Department who consistently broke departmental rules and state laws did not appreciate the diligence with which Tokowitz performed his duties. As a result, they engaged in a multi-year campaign of harassment and retaliation that ultimately drove Tokowitz to resign.

### Neal Tokowitz

13.     In 1992, the Department created the Department of Community Supervision and Intervention ("DCSI") to address problems related to jail overcrowding. Tokowitz successfully wrote two grants to get the Sheriff's Work Alternative Program hundreds of thousands of dollars. Naturally, Tokowitz was then selected to administer the grants.

14.     Just as Tokowitz was experiencing the first of his many impressive accomplishments, he also saw the underside of the Department, where rules were routinely flouted and personal relationships trumped competence.

15.     Tokowitz's next assignment was to a sub-unit of DCSI called "Day Reporting" in which he was assigned to write the Investigation's Order that would establish the rules of conduct and disciplinary procedures to be enforced by Internal Affairs. This Order was approved and implemented, yet he was not even considered for the role of IAD Director.

16.     Moreover, despite having, upon information and belief, higher test scores than most people who had recently sat for the First Sergeants Merit examination, when the list of people who passed came out, Tokowitz was mysteriously not on it, thereby denying him yet another opportunity.

17.     Tokowitz was eventually promoted by DCSI Director Dan Devane as the Deputy Director of the Internal Affairs Division ("IAD"), a position at which he excelled, performing duties such as creating an internal training program for DCSI personnel and writing most of the lesson plans.

18.     In the Deputy Director position, Tokowitz was working at pay grade 12 even though he was supposed to be, based on his position, a pay grade 16 as all investigators in DCSI were a minimum pay grade 16. He repeatedly asked Director Devane to change his pay grade accordingly, but Director Devane refused.

19.     In or around 1995, Tokowitz requested the opportunity to take the Supervisor's Course at Northwestern University. Upon information and belief, he was the only Cook County employee to take the class or even express any interest in taking it.

20.      Tokowitz earned an A in the class and upon his return to work, he drafted a Supervisor's Manual and began teaching the material to supervisors.

21.      At some time in 1995 or 1996, it came to Tokowitz's attention through his role in Internal Affairs that an officer named Marcy Damen was sexually harassing male and female coworkers. Concerned with the effect sexual harassment might have on the Sheriff's Office and the DCSI, Tokowitz undertook an investigation into the sexual harassment. At around the same time, Bill Wallace became Director of IAD. Wallace is currently the Executive Director of DCSI.

22.      At the end of Tokowitz's investigation, he and Wallace recommended that a complaint file be opened against Chief Denis Micnerski who was complicit in Damen's sexual harassment.

23.      Rather than be lauded for his thorough work, Tokowitz and Wallace were harshly reprimanded by Jim Ryan, a new attorney who was the Operations Manager for the Department and the Sheriff's nephew. Although the proper course was to take the recommendation of IAD to the Inspector General's office, Ryan ended the investigation immediately.

24.      Around the same time, Tokowitz was downgraded from Deputy Director to Investigator, though he remained at pay grade 12, which was lower than either position was for others at the same level.

25.      Shortly thereafter, a civilian filed a criminal complaint against Officer Damen alleging battery and sexual harassment. The investigation on Damen was restarted, and the same conclusions were reached. When Ryan began taking steps to once again end the investigation since it revealed that Micnerski, who was Damen's supervisor, had ignored complaints of sexual

harassment and abuse from his subordinates, Tokowitz made clear that he would tell the truth if called to testify, including details about Ryan killing the initial investigation.

26.     Two weeks later, Wallace called Tokowitz into the office and pressured him not to follow up on his threat to expose Micnerski. Fearing for his job and his personal safety, Tokowitz dropped the investigation.

27.     In August 1998, Tokowitz was promoted to Deputy Chief of SWAP and was instructed to get control of the various administrative and supervisory problems. Despite the promotion and despite Devane's explicit promise to change Tokowitz's pay grade when the next budget was prepared, there was ultimately no pay raise. However, the person who replaced Tokowitz as Investigator was installed at pay grade 16, a full four levels higher than where Tokowitz had been for years. Moreover, deputy chiefs were pay grade 18, but Tokowitz's pay grade was not changed.

28.     Tokowitz's first assignment, which came from Deputy Executive Director Wallace, was to rewrite and/or create new General Orders for SWAP. Of course, Tokowitz had written the last set of orders years before. So, effectively he was being asked to redo work that he had already done.

29.     When Tokowitz arrived at his new office in Maywood, Illinois, he discovered that SWAP Director Ray Doran had no idea he was coming and had no assignment for him. Rather than accommodate Tokowitz, he was assigned to work at a desk in the hallway that was not only humiliating, but made it impossible for him to work on his confidential files.

30.     When Tokowitz asked for an office, he was told there were none available, something that was demonstrably untrue as offices were occupied by clerical personnel. It was clear that Tokowitz was being punished for having the nerve to do his job properly, which

included investigating charges of sexual harassment and recommending punishment when appropriate. Tokowitz inquired why he was not provided with an office, but Tokowitz's superiors ignored his requests.

31.     Even after getting an office that had previously been used for storage, Tokowitz was given no new assignments. Instead he continued working on new General Orders. When he finished those, he turned them in and received no feedback.

32.     In or around 2001, most of SWAP including Tokowitz moved into new offices. While he finally had an office on par with his peers, Tokowitz was still not given much work to do, and was given no assignments of significance. He constantly asked for assignments, but was consistently refused. He continued to try and find out his pay grade, and other Deputy Chiefs told him they were pay grade 18. That said, Tokowitz was not being paid at that level.

33.     When Tokowitz was finally given an assignment of some substance, filling in as an instructor at the academy, he leapt at the chance and did an excellent job. However, after teaching several weeks, he was told he was not going to be asked back because he had given a couple students C's. Once again, for simply enforcing rules and maintaining standards, Tokowitz was retaliated against.

34.     Tokowitz was then given the chance to teach at a continuing education academy for officers, which he did twice a week and did well.

35.     Around the same time, Wallace asked Tokowitz to find a way to get twelve additional vehicles for DCSI. Tokowitz went far above and beyond and identified a deal that would actually get the department several dozen cars, vans and busses. Inexplicably, Wallace refused to approve the deal and refused to offer a reason. It soon became clear that the reason the deal was so good was because Tokowitz's plan would have avoided all of the wasted funds

that normally went to friends and supporters of the department higher ups who had a financial interest in the auto business.

36.     Still with no assignment at his office no matter how much he requested them, Tokowitz taught two days a week and worked essentially as a clerk at Traffic Court, assignments that were well below those of other Deputy Chiefs.

37.     Training Director O'Sullivan, who did not work in Tokowitz's office, then gave Tokowitz two assignments. First, he asked Tokowitz to update the way firearms training records were stored. Second, he wanted Tokowitz to take over as the DCSI Training Director. Tokowitz said he would like the new position and O'Sullivan said once he finished the project on the training records, the training job would be his.

38.     Tokowitz immediately threw himself into the first assignment. However, just a couple of weeks later, he received a memo from the new DCSI Training Director, the position that had been promised by O'Sullivan.

39.     In late summer of 1999, following another long period of being virtually ignored by his superiors in his office, Tokowitz was asked by Kevin Phillips, the Director of the Sheriff's Emergency Management Agency, to write a grant application. Despite only having a couple of weeks before the deadline, Tokowitz was able to get everything done with no supervision and the office got a $300,000 grant.

40.     Rather than being praised for his accomplishments and given more responsibility as would be appropriate for someone of Tokowitz's level, things soon actually got worse for him. An anonymous complaint was filed against him, purportedly by one of his students. He was found guilty of disclosing confidential information and promptly appealed as the allegations were not only untrue, but actually in violation of departmental rules.

41.     His superiors then actually instructed Tokowitz to drop his appeal, which he of course refused to do. The appeals board then ruled the investigation was invalid. Not to be deterred from their harassing conduct, the Inspector General arranged for Tokowitz to be "randomly" drug tested five times in the next four weeks, all of which Tokowitz passed.

42.     Not long after that, Henry Barsch, IAD Director of the Department of Corrections called Tokowitz to demand why he told officers "all those things" in class. When he explained what "all those things" were, Tokowitz made clear that that was the law. Thereafter, Tokowitz was told not to return to class, and he was never allowed to teach or write training or study materials again.

43.     Once again, Tokowitz was being punished for simply doing his job and doing it well.

44.     In approximately August, 2001, Wallace asked Tokowitz to undertake a "special" and "sensitive" investigation, to look into allegations against Gordon Kalb, the Field Chief of SWAP. After being assured by Wallace and IAD Director Healy that neither he nor any of his informants would be punished for helping in the investigation of someone as powerful as Chief Kalb, Tokowitz agreed to lead the inquiry.

45.     Tokowitz spent more than two months on the investigation, which included interviews with more than forty witnesses. What he discovered was truly shocking: the evidence clearly showed that Chief Kalb had engaged in a multi-year pattern of massive sexual harassment and discrimination among other illegal behaviors and had no fear of punishment.

46.     Additionally, numerous male supervisors who worked under Kalb also engaged in a pattern of sexual harassment, something their boss had allowed them to do without fear of repercussions.

47.    At one point in the course of the investigation, Director Doran actually tried to intercede and stop Tokowitz from talking to a witness. When Tokowitz was finally able to conduct that interview, he found that she was another officer who would confirm that she had been sexually harassed by Chief Kalb. During the investigation, Tokowitz was threatened that "he would have more trouble within the department" if he continued to investigate.

48.    At the end of the investigation, Tokowitz submitted a report that concluded Chief Kalb had engaged in a pattern of illegal sexual harassment and discrimination.

49.    When Tokowitz submitted his report, he included a statement that he would consider any retaliation, especially if his duties were changed to clerical, to be a violation of the Whistleblower's Act.

50.    Tokowitz was assigned to help out one day a week in the Maywood office doing intake work. Not long thereafter, Chief Gordon Kolb showed up and declared loudly and in public that Tokowitz was being assigned to intake duties, a clerical assignment far below his rank.

51.    Making matters worse, Chief Kolb declared that Tokowitz was now to report directly to Chief Kolb.

52.    Tokowitz then met with Wallace and demanded this violation of the Whistleblower's Act be fixed. When Tokowitz returned to his office, Chief George Tamez offered Tokowitz the chance to return to duty on the street, something Tokowitz had wanted for years. Even when Chief Tamez explained that the only way it was possible would be if Tokowitz was willing to return to wearing a uniform, downgrade from an unmarked car to a squad car, and work most weekends and on an unpredictable schedule. Despite all of the effective demotions, Tokowitz agreed to the terms but he kept his badge and remained the deputy

chief of SWAP, at the same pay grade 18, even though his pay grade had never been effectively changed.

53.     In Tokowitz's new office in Skokie, he continued to go above and beyond what was demanded of him. There were rules all officers had to follow and he took them seriously.

54.     Tokowitz, the highest ranking individual in uniform in Skokie, attempted to enforce the rules. Yet every single time he wrote someone up, his superiors ignored him.

55.     Moreover, Tokowitz's offers to teach classes to the officers in the district went unanswered. When he went ahead and taught lessons as opportunities arose, his superiors barely acknowledged his efforts, if at all. He was certainly never rewarded for it.

56.     Eventually, Chief Tamez actually told Tokowitz to stop going to the other districts. In other words, Chief Tamez instructed Tokowitz to stop doing his job.

57.     As time went on, so did the continuous shots at Tokowitz. For example, when Tokowitz was finally assigned a new car benefitting a Deputy Chief, he was almost immediately publicly instructed to give up the car so that a lower ranking officer could have it.

58.     Still determined to make things work, Tokowitz continued to do his job and do it well. He soon discovered that Sergeant James Righeimer was grossly negligent in his duties. Tokowitz told Chief Tamez he was filing a complaint against Sergeant Righeimer and his supervisor, Lieutenant Jack Norton, who had allowed Righeimer's behavior. Chief Tamez instructed Tokowitz not to investigate the Lieutenant and Tokowitz acquiesced.

59.     Tokowitz did investigate Sergeant Righeimer and found out that he was even worse than he originally thought. Tokowitz filed a complaint letter, but rather than be punished, Sergeant Righeimer was actually rewarded with a plush new assignment in headquarters.

60.     Still, Tokowitz persisted in doing his job and doing it well. He published a memo on a disaster drill, which was promptly ignored. He went to a seminar put on by the federal government and subsequently made suggestions and requests, all of which were ignored. He made formal complaints, wrote training documents, and did roll call training, all of which were part of his duties and all of which were ignored.

61.     In December 2003, Tokowitz was injured in the course of his duties. While he was out, he was virtually ignored as the Department seemingly went out of its way to make things difficult for him.

62.     When he returned to work in August, things only got worse. First, Tokowitz was told he would not have a car, something unheard of for someone of his rank. Second, he learned that his ID card had been destroyed, so he could not work until he got a new one. He did everything he had to do to get the new ID, yet no card came. He was told that was because the machine that makes the cards was broken, but other people somehow were managing to get cards from the "broken" machine.

63.     Finally, Tokowitz discovered that, in fact, his credentials had been in the office of the DCSI Training Chief. When Tokowitz inquired, Chief Tamez claimed there were "administrative problems" standing in the way. Chief Tamez continued to come up with excuses to stop Tokowitz from getting his ID until the middle of October, a full two months after he had returned to work.

64.     Upon information and belief, the refusal to give Tokowitz his ID card was part of a calculated effort to embarrass him as it effectively prohibited him from doing his job.

65.     Even with the new ID card, the retaliation against Tokowitz continued. He was removed from street duty against his wishes and reassigned to the office in Maywood.

### The Retaliation Toward Tokowitz Escalates

66.     Once Tokowitz arrived in Maywood, things went from bad to worse as he was singled out for mistreatment and effectively treated as the office joke by superiors and subordinates. For example, he was assigned to a desk that did not even have a word processor. When he finally was given a word processor, it was not hooked up to the office network.

67.     He was the only person at his level who was prohibited from working for seven and a half hours and effectively taking his lunch break at the end of the shift.

68.     He made numerous suggestions and constructive criticisms, all of which were completely ignored.

69.     His superiors had a screen put up in front of his desk, effectively isolating him from the rest of the office.

70.     He was never allowed to work overtime, despite numerous requests by him to do so, notwithstanding that other employees were allowed to work overtime upon request.

71.     Tokowitz's orders were repeatedly countermanded, he was not allowed to attend meetings and he was given a word processor that was never hooked up to the system. When Tokowitz complained, the deputy director of SWAP told Tokowitz he was "lucky to still have a job."

72.     Tokowitz held on as long as he could, eager to do his job, but with no end to the retaliatory treatment in sight, he finally reached his breaking point and was constructively discharged on September 30, 2008.

### COUNT I
### (Violation of Title VII of the Civil Rights Act of 1964)

73.     Plaintiff hereby incorporates by reference, as though restated, each of the factual allegations in paragraphs 1 through 72 above as and for paragraph 73 of this Count I.

74.     Defendant is an employer within the meaning of the Civil Rights Act of 1964, 42 U.S.C.§2000e-5 (the "Act"), in that it engages in an industry affecting commerce, and, upon information and belief, it employs more than 150 regular employees.

75.     At all times material hereto, Plaintiff performed at or above Defendant's legitimate expectations.

76.     The Act, 42 U.S.C. §2000e-5(a), prohibits retaliation against employees for assisting or participating "in any manner" in an investigation into behavior prohibited by title VII.

77.     As set forth more specifically above, defendant retaliated against Tokowitz for his investigations into, and reports of, the misconduct of other employees, including his superiors, as well as his other efforts to improve the Sheriff's Office and prevent the waste of its resources.

78.     As a result of his discriminatory conduct, Tokowitz suffered damages, including but not limited to:

       a.     loss of time;

       b.     loss of benefits;

       c.     loss of professional opportunities and future income;

       d.     emotional distress; and

       e.     damage to his professional reputation.

WHEREFORE, the plaintiff, Neal Tokowitz, respectfully requests that this Honorable Court enter judgment in his favor and against the defendant, Cook County Sheriff's Office, for a sum proven at trial, with costs assessed.

## COUNT II
### (Breach of Contract)

79. Plaintiff hereby incorporates by reference, as though restated, each of the factual allegations in paragraphs 1 through 72 above as and for paragraph 79 of this Count II.

80. Upon hiring Tokowitz, defendant and Tokowitz entered into an agreement whereby defendant agreed to pay Tokowitz in accordance with the applicable pay grade for his position as it existed from time to time. In particular, the parties agreed that Tokowitz would be a pay grade 12 at the start. When he became the deputy director of IAD, he was to be increased to pay grade 16, and then when he became deputy chief of SWAP, he was to be pay grade 18.

81. Tokowitz performed the obligations required of him pursuant to the agreement.

82. Defendant breached the agreement with Tokowitz in that it failed to pay him consistent with the applicable pay grade for his position as it existed from time to time.

83. As a result of defendant's breach of the agreement, Tokowitz has suffered damages in the amount of the difference in pay actually received compared to the pay he would have received had defendant paid him consistent with the applicable pay grade for his position.

WHEREFORE, the plaintiff, Neal Tokowitz, respectfully requests that this Honorable Court enter judgment in his favor and against the defendant, Cook County Sheriff's Office, for a sum proven at trial, with costs assessed.

NEAL TOKOWITZ

By:_____s/ Joseph R. Ziccardi_____
     Attorney for Plaintiff

Joseph R. Ziccardi, Esq.
Gabriella Moretti, Esq.
Brendon I. Martin, Esq.
ZICCARDI LAW OFFICES
20 North Clark Street, Suite 1100
Chicago, Illinois 60602
(312) 372-3477

# EXHIBIT A

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|

**CHARGE OF DISCRIMINATION**

This form is affected by the Privacy Act of 1974. See Privacy act statement before completing this form

Illinois Department of Human Rights and EEOC
*State or local Agency, if any*

AGENCY
[ ] FEPA
[X] EEOC

CHARGE NUMBER

NAME *(Indicate Mr. Ms. Mrs.)*
Neal Tokowitz

HOME TELEPHONE *(include Area Code)*
(847) 933-0073

STREET ADDRESS
4833 W. Pratt Ave.

CITY, STATE AND ZIP CODE
Lincolnwood, IL 60712

DATE OF BIRTH
04/22/1943

NAME
Cook County Sheriff's Office

NUMBER OF EMPLOYEES, MEMBERS
+15

TELEPHONE *(Include Area Code)*
(312) 603-6444

STREET ADDRESS
50 W. Washington

CITY, STATE AND ZIP CODE
Chicago, IL 60602

COUNTY
Cook

NAME

NUMBER OF EMPLOYEES, MEMBERS

TELEPHONE *(Include Area Code)*

STREET ADDRESS

CITY, STATE AND ZIP CODE

COUNTY

CAUSE OF DISCRIMINATION BASED ON *(check appropriate box (es)*

[ ] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN

[X] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] OTHER *Pregnancy Act*

DATE DISCRIMINATION TOOK PLACE
EARLIEST *(ADEA/EPA)*   LATEST *(ALL)*

[X] CONTINUING ACTION

THE PARTICULARS ARE *(if additional space is needed attach extra sheet(s)*

See attached.

RECEIVED EEOC

MAY 1 1 2009

CHICAGO DISTRICT OFFICE

"OFFICIAL SEAL"
Tammy A. Manis
Notary Public, State of Illinois
My Commission Exp 07/17/2010

[x] I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone Number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 5/5/09  Charging Party: _Neal S. John_

State of Illinois
County of Cook

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT    DATE

Sworn to and subscribed to before the undersigned notary public in and for said jurisdiction this 5 day of _May_ 2009

my commission expires 07 17 10

_Tammy A. Manis_
Notary Public

EYHIBIT A

## Charge of Discrimination of Neal Tokowitz

I.  I was employed by the Cook County Sherriff's Office from August 1st, 1988 through September 30th, 2008.

II.  I was singled out and treated as *persona non grata* after I began reporting illegal activity, mostly involving sexual harassment of several female officers. Due to bringing this to the attention of my superiors, I was given a desk in the hallway without a computer or adequate supplies necessary for my job while clerks who were subordinate to me were given offices and the materials they required. Furthermore, I was stripped of my authority for all intents and purposes, not included in meetings attended by all other employees in my same position, and told on several occasions to stop writing grants (which I had successfully done for the Sheriff's Office on numerous prior occasions) for no legitimate reason.

III.  Specifically, and by way of example and not intended as an exhaustive list, I reported: various claims of sexual harassment and illegal orders against Chief Gordon Kalb; observation of a female officer being asked to "give a blow job" in front of a group of male officers; and claims of physical abuse of young officers by their superiors.

IV.  I actively and enthusiastically served the Sheriff's Office for 20 years, without a review stating anything less than "meets" or "exceeds" the standard of performance. In return for my hard work and willingness to stand up and protect my fellow officers and the integrity of the Office, as my record shows, I was publicly humiliated and pushed to the mental breaking point during my final years of service.

V.  Throughout my tenure with the Sherriff's Office I remained a grade 12 despite being told I was promoted to a grade 16 and later a grade 18. My salary during that time ranged between approximately $34,000 and $47,000 while the stated salary for grade 16 and 18 positions was

1

significantly higher. I estimate that my salary would be approximately $8,000 higher per year had I been paid correctly.

VI. I believe that the disparity in my salary, and the adverse treatment I received on the job, were the direct result of my reporting of numerous violations of state and federal laws.

# EXHIBIT B

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Neal Tokowitz<br>4833 W. Pratt Ave.<br>Lincolnwood, IL 60712 | From: | Chicago District Office<br>500 West Madison St<br>Suite 2000<br>Chicago, IL 60661 |
|---|---|---|---|

**CERTIFIED MAIL 7010 0780 0001 7853 4289**        CP

[ ]  On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 440-2009-04555 | Vittoria Incandela,<br>Investigator | (312) 886-9838 |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X]  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

Enclosures(s)

_John P. Rowe_        6/28/10

John P. Rowe,
District Director        (Date Mailed)

cc:    **COOK COUNTY SHERIFF'S OFFICE**

EXHIBIT B