# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| NEAL TOKOWITZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Judge Joan B. Gottschall |
| v. ) | |
| ) | Case No. 10 C 6094 |
| COOK COUNTY SHERIFF'S OFFICE, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Neal Tokowitz filed an amended complaint in January 2011, alleging that he was subjected to a "campaign of harassment and retaliation" while he was employed with the Cook County Sheriff's Department, and that this campaign ultimately led to his constructive discharge. His two-count complaint alleges retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and breach of contract. The defendant, the Cook County Sheriff's Office ("the Sheriff"), has now filed a motion for summary judgment on both counts. For the reasons set forth below, the court grants the motion.

# I. BACKGROUND

The following facts are undisputed unless otherwise noted.[1] Tokowitz began working in the Cook County Sheriff's Office on August 1, 1988. Upon graduation from the Sheriff's Academy, he became the administrative assistant for the Director of Community Service, where he remained until 1991 or 1992. He was then assigned to the Department of Community Service and Intervention ("DCSI") and—after working on creating the general orders for the new Internal Affairs Division ("IAD") of DSCI—Tokowitz became an investigator with that division. Tokowitz claims that around this time, Inspector General Richard Stillings led Tokowitz to believe he would become the director of IAD, but Dave Devane, the Executive Director of DCSI, told Tokowitz that he was not going to be the director, although Tokowitz could be an investigator for IAD if he wanted. Tokowitz took the investigator job. At some point, Devane did make Tokowitz the Deputy Director of IAD.

---

[1] The court has deemed various Statements of Fact ("SOF") to be admitted based on improper objections. For instance, Tokowitz objects to certain of the Sheriff's statements for lack of relevance, without providing any further basis for the objection. (*See, e.g.*, Resp. to Def.'s SOF ¶¶ 17-20.) Next, Tokowitz objects to various statements on the ground that they are "inaccurate," "consist[ ] of Defendant's opinion," and are "argumentative," but his response make it clear that his only objection is that the facts are introduced by the phrase "Tokowitz believes" or "Tokowitz claims." After objecting, Tokowitz turns around and sets out the same statement of fact, but characterizes the fact as being one Tokowitz "testified" to. (*See id.* at ¶¶ 26-28, 30, 34, 36, 38-43, 46, 48, 50, 58.) The substantive difference between these two formulations is beyond this court's ken. Tokowitz also improperly attempts to introduce additional facts. (*See id.* at ¶¶ 36, 43, 46, 52.) The court disregards the additional facts, and deems all of the Sheriff's facts described above to be admitted. But the Sheriff is not innocent either. The Sheriff objects to facts on the mistaken ground that they call for a legal opinion (*see* Def.'s Reply to Pl.'s SOF ¶ 3) or objects in an attempt to exclude Tokowitz's testimony regarding his feelings, which is a matter within Tokowitz's personal knowledge (*see id.* ¶ ¶ 19, 22, 23). The Sheriff also claims that certain facts are "conclusory" or "argumentative," but fails to substantively deny the facts at issue. (*See id.* ¶¶ 19, 22, 23, 27.) In addition, instead of admitting certain facts, the Sheriff simply "does not deny" that the facts are supported by admissible evidence. (*See, e.g.*, ¶¶ 22, 24, 25, 26, 29, 32, 37) The meaning of such carefully crafted non-evasions is lost on this court. These facts are deemed admitted. Finally, without obtaining leave of court, the Sheriff filed a "Reply to Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Facts in Support of Summary Judgment." No such reply is contemplated by the Local Rules, and the reply has been disregarded in its entirety. *See Pulliam v. City of Chi.*, No. 08 C 7318, 2010 WL 3238837, at *4 n.2 (N.D. Ill. Aug. 12, 2010); *Cent. States, Se. & Sw. Areas Pension Fund v. Sara Lee Bakery Group*, 660 F. Supp. 2d 900, 908-09 (N.D. Ill. 2009).

In 1998, Ed Healy, an independent director who reported to Devane, told Tokowitz that Tokowitz would be promoted to Deputy Chief of the Sheriff's Work Alternative Program ("SWAP"), another division of DCSI.[2] In his deposition, Tokowitz testified that Devane did in fact promote him to the Deputy Chief position and that Devane informed Tokowitz that his pay grade would be raised to Grade 18 by November 1, 1998.[3] Since at least mid-1993, Tokowitz's pay grade had been at Grade 16. But when the budget was announced in November 1998, Tokowitz realized he had not been raised to Grade 18.[4] Tokowitz spoke with Devane about it, and Devane told Tokowitz that he would "take care of it," yet no changes to Tokowitz's pay grade were made.

During this time, Tokowitz was assigned to work out of the Maywood facility. Ray Doran, the Director of SWAP, did not know Tokowitz had been assigned to that facility, and Tokowitz was given a desk in a hallway. While he was in Maywood, Tokowitz worked on several projects for Devane, including writing general orders and working on disciplinary procedures. When SWAP Headquarters moved from the Maywood facility to one at 31st and California, Tokowitz was given an office that was

---

[2] The Sheriff objects, but only on the ground that Devane did not have the authority to promote or change a merit rank of a SWAP employee. (*See* Def.'s Reply to Pl.'s SOF ¶ 8.) This is non-responsive and does not address the question of whether Healy informed Neal that he would be promoted; thus, the fact is deemed admitted.

[3] The Sheriff contests this point, but only cites Devane's inability to recall the conversation in support. (*See* Def.'s Reply to Pl.'s SOF ¶ 11.) This response does not raise a genuine issue of fact, particularly coming from the movant. *See Ace Rent-A-Car, Inc. v. Empire Fire & Marine Ins. Co.*, 580 F. Supp. 2d 678, 690 n.5 (N.D. Ill. 2008) ("His inability to recall is not a denial, and is not sufficient to raise a genuine issue of material fact for purposes of this motion."); *Brown v. Chi. Transit Auth. Retirement Plan*, No. 01 C 9340, 2005 WL 6295798, at *5 (N.D. Ill. July 22, 2005). In any event, Tokowitz goes on to accurately state that Devane did not recall the conversation. For this reason, the court deems Tokowitz's statements of fact ¶¶ 11, 13, 15, 17, and 28 to be admitted.

[4] In the Sheriff's Office, some job and position titles are different than the titles that actually appear on the payroll or budget. Tokowitz was listed in the budget as an Investigator 2 or an Administrative Assistant when he had the title of Deputy Chief; the Deputy Chief position did not exist in the budget or payroll.

close to the Chief. At the new facility, Tokowitz was not invited to supervisors' meetings, although he was not prevented from attending the meetings when he showed up.

In March 1999, Tokowitz spoke with Ray Doran about his pay grade. In addition, Tokowitz raised a number of other issues with Doran, including that Tokowitz's inferior officers were insubordinate and countermanding his orders, and that his disciplinary recommendations were being ignored by the Lieutenant and the Chief of SWAP. Doran replied that he thought Tokowitz already was a Grade 18. Tokowitz then wrote a memo to, and met with, Devane regarding the pay grade issue. Devane told Neal that Neal should "quit if he didn't like it." Tokowitz never brought the Grade 18 issue to the attention of any official in the chain of command above Devane.

Both Devane and Doran testified that they do not recall these conversations. In fact, the Sheriff claims it would be "highly unusual" for employees (other than the directors of each department of DCSI) to report to Devane on issues those employees were having within their respective positions. The parties also dispute whether Devane had the authority to promote employees: the Sheriff claims Devane did not have this authority, whereas Tokowitz claims that Devane was the "final arbiter of promotions and pay grade." There have been times where Devane would recommend that an employee have his or her pay grade upgraded, but the Department of Personnel would not upgrade that employee; there have also been times where Devane would receive recommendations about personnel issues such as promotions, and Devane would "approve" the promotion (although it is not clear whether this approval was final for purposes of the promotion). In any event, Tokowitz's pay grade did not change from Grade 16.

In 2001, Bill Wallace—Tokowitz's one-time boss in IAD—asked Tokowitz to investigate Gordon Kalb, a Chief in DCSI, for sexual harassment. In the past,[5] Tokowitz had investigated allegations of sexual harassment, but that investigation had resulted in Tokowitz being "publicly humiliated, threatened, and told to drop the investigation." As early as 1998, Tokowitz had raised allegations of sexual harassment with Kalb, at which point Kalb told Tokowitz that Tokowitz was "going to be a clerk." Before starting the 2001 investigation, Tokowitz requested that steps be taken to prevent retaliation from Kalb. Tokowitz ultimately provided an investigation summary to the Director of IAD on September 15, 2001 concerning Kalb's alleged sexual harassment. During the investigation, Tokowitz's life was threatened by one of Kalb's friends, Chuck Ranzino. Tokowitz filed a complaint with IAD, but he did not attempt to initiate a criminal investigation. Kalb also confronted Tokowitz, telling Tokowitz that he would "never see the street again" and that he would "be a clerk for the rest of [his] life."

Sometime after Tokowitz's investigation, he was told by George Tamez, Chief of SWAP, that he would be placed out on street patrol to supervise crews of offenders and act as a problem solver.[6] Tokowitz was given a marked car and had to work a rotating shift, but he accepted the assignment to go back on the street. During this assignment, Sergeants Enriquez and Righeimer typically ignored Tokowitz's orders, and when

---

[5] Neither the dates nor the people involved in this earlier investigation were specified by Tokowitz in the summary judgment pleadings, although the amended complaint indicates that the incident involved someone by the name of Marcy Damen and Damen's supervisor, Chief Denis Micnerski, in 1995 or 1996. (*See* Pl.'s SOF ¶ 22; Am. Compl. ¶¶ 21-26.)

[6] Tokowitz objects, stating that he "had no supervisory authority" and that various sergeants and supervisors would ignore his orders. These statements are not at odds: Tokowitz's own testimony establishes that Tamez gave Tokowitz supervisory authority over offender crews and that Tokowitz was to be a problem solver. (*See* Tokowitz Dep. at 65:3-8, ECF No. 51-1.) While there may be a dispute regarding whether Tokowitz was able to wield supervisory authority over his inferior officers, that is not the issue presented by the Sheriff's statement of fact. (*See* Def.'s SOF ¶ 47.)

Tokowitz tried to discipline them, his disciplinary efforts were ignored by the others, including Tamez, Doran, and a lieutenant. At one point, Sergeant Enriquez told Tokowitz's deputies not to pay attention to Tokowitz's orders, and that they were going to be getting rid of Tokowitz soon.

Tokowitz remained on the street assignment until he received a severe head injury while on duty in December 2003; as a result, he was off duty until 2005. When Tokowitz returned to duty, Tamez told Tokowitz that he would not be allowed to go back on the street, and that he was "going to Maywood to be a clerk."[7] Tokowitz was assigned to Maywood to review SWAP incident reports, medical incident reports, and assist in registration and intake of offenders for SWAP. Tokowitz was not given a car, and he was assigned a screened-off desk in a hallway without a computer or assignments. When he requested a word processor, Tokowitz was provided with a computer that was not hooked up. Gordon Kalb would visit the Maywood office and tell Tokowitz that he would be "down here until [Kalb] decide[s]."

The Sheriff notes that offices were given to personnel when offices became available. In fact, there were times when Tamez did not have an office due to space restrictions, and Tamez did not have a Sheriff's vehicle. Moreover, in SWAP computers were sparse and not everyone had their own individual computer, and there were times when Tamez was a Deputy Chief in SWAP that he had to do intake and clerical work.

Following his return to work, Tokowitz could not carry a firearm until he had been recertified and had received credentials. If a sheriff's deputy chief did not have his

---

[7] While the Sheriff objects, the only evidence cited in support is Tamez's testimony that no one told Tamez to place Tokowitz at a desk that was in the hallway. (*See* Def.'s Reply to Pl.'s SOF ¶ 31.) The full context of the quote makes clear that Tamez is stating that he was not specifically instructed as to where to physically locate Tokowitz in the office. As the cited support is not in opposition to Tokowitz's fact, the fact is deemed admitted.

credentials, but carried a weapon on duty, that person could be disciplined and possibly even arrested. In order to obtain new credentials, Tamez would request the return of credentials from IAD, and after IAD approved, the credentials were returned either to the employee or to George Tamez. According to Tokowitz, Tamez intentionally held up the return of Tokowitz's credentials by requesting that the Director of Training for DCSI not return the credentials to Tokowitz.[8] Tokowitz did eventually receive his credentials.

Neither of Tokowitz's supervisors recalls any complaints about Tokowitz or Tokowitz's performance. Tokowitz stayed in his position from his return to work in 2005 until September 2008, at which point he had accrued twenty years service and was able to retire and switch to Medicare. Tokowitz filed his charge of retaliation on May 11, 2009.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the court will grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In particular, the court will grant a motion for summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

At the summary judgment stage, "a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party." *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628

---

[8] The Sheriff objects, but the evidence cited in support merely states that there was not "any reason" for the delay in getting Tokowitz his credentials. (*See* Def.'s Reply to Pl.'s SOF ¶ 33.) Reading the full quote in context, it is clear that Tamez testified he could not recall any of the circumstances surrounding the delay in getting Tokowitz his credentials, and that Tamez could not, based on the documents before him, identify any reason for the delay. This fact is deemed admitted.

7

(7th Cir. 2006). "A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Id.* at 628 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). Doubts about the existence of a material fact "should be resolved in favor of the nonmoving party and summary judgment ought to be denied." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).

### III. ANALYSIS

Tokowitz's amended complaint alleges that he was subjected to "a multi-year campaign of harassment and retaliation due to his efforts to enforce rules, end sexual harassment within the Department and seek pay commensurate with his pay grade and position." In Count I, he alleges that the Sheriff retaliated against him for his investigations into the misconduct of other employees, "as well as his other efforts to improve the Sheriff's Office and prevent the waste of its resources," in violation of Title VII, 42 U.S.C. § 2000e-3(a).[9] In Count II, Tokowitz alleges that the Sheriff breached a contract providing that Tokowitz would be paid at Grade 18 when he became Deputy Chief of SWAP. The court turns to the retaliation claim first.

**A. Title VII Retaliation**

A plaintiff can establish retaliation via the direct or indirect method of proof. *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). Here, Tokowitz makes it clear that he intends to proceed under the direct method of proof. (*See* Mem. in Opp'n to Def.'s Mot. for Summ. J. at 4.) To survive summary judgment, then, Tokowitz has to present evidence that (1) he undertook an activity protected by Title VII; (2) his employer took a

---
[9] While the complaint cites 42 U.S.C. § 2000e-5(a), that subsection deals with the powers bestowed upon the Equal Employment Opportunities Commission, and so the court presumes that the citation is a typographical error.

8

materially adverse action against him; and (3) a causal connection existed between the protected activity and the adverse action. *Coleman*, 667 F.3d at 859.

    1. Protected Activity

Tokowitz's amended complaint sets out a litany of slights, insults, and mistreatments during his twenty years of employment. For instance, he describes being passed over for the IAD Director position, "mysteriously" being excluded from a list of those that passed a particular exam, being forced to re-do work he had already done, not being given an office or assignments, being falsely accused of disclosing confidential information, being subjected to numerous random drug tests, being ignored when he wrote up disciplinary infractions—the list goes on and on. Yet even assuming that all of these acts constitute "adverse actions," which is doubtful, the vast majority of them do not relate to any activity protected under Title VII. Title VII prohibits employer discrimination on the basis of race, color, religion, sex, or national origin, so for Tokowitz to engage in statutorily protected activity, he had either to oppose a practice made unlawful by Title VII (i.e., one relating to discrimination on the basis of race, color, religion, sex, or national origin), or make a charge, testify, assist, or participate in an investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000e-3(a). Most of the putative adverse acts alleged in Tokowitz's complaint have no relationship whatsoever to any alleged protected activity, and so they cannot form the basis for his retaliation claim. In other words, any retaliation against Tokowitz for his attempts generally to "enforce rules," "improve the Sheriff's Office," or "prevent the waste of its resources" is not actionable under Title VII.

In his responsive pleading, he seems to recognize this, and instead focuses on a single protected activity: his 2001 investigation into the allegations of sexual harassment by Kalb. (*See* Mem. in Opp'n to Def.'s Mot. for Summ. J. at 4-5 ("[Tokowitz] asserts that he participated in an investigation of sexual harassment, and as a result of his participation in the investigation, he suffered discrimination by never being promoted, being marginalized, and never obtaining the pay grade promised him.").) Because sexual harassment may qualify as a form of sex discrimination under Title VII, *see E.E.O.C. v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 432 (7th Cir. 2012), if Tokowitz establishes an adverse employment action and a causal connection between his investigation and that adverse action, he would survive summary judgment.

2. Adverse Employment Action/Causal Connection

Tokowitz does not clearly or consistently identify the employment actions that he believes are "adverse" for purposes of Title VII. For instance, while Tokowitz repeatedly emphasizes his constructive discharge in his complaint, he does not mention this argument in his responsive summary judgment pleadings. Even assuming he intended to do so, the court finds no evidence of constructive discharge. A constructive termination occurs where an employee "was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (citations omitted). There are two forms of constructive discharge, but both require that the work environment has become "intolerable." *See id.* In the first form of constructive discharge, the employee resigns due to "working conditions even more egregious than that required for a hostile work environment claim," such as threats of physical violence. *Id.* The second form of

constructive discharge takes place "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *E.E.O.C. v. Univ. of Chi. Hosp.*, 276 F.3d 326, 332 (7th Cir. 2002). Tokowitz has not introduced any facts that would suggest either of these two scenarios; instead, the evidence of record establishes that he waited to retire until he had accrued twenty years of service and was eligible for certain retirement and Medicare benefits. Constructive discharge cannot be the adverse employment action.

Tokowitz next points to the pay grade issue, arguing that "[a]fter Kalb's threat, [Tokowitz] never obtained the pay grade he was promised." (*See* Mem. in Opp'n to Def.'s Mot. for Summ. J. at 5.) But Tokowitz cannot prove any causal link between the two. Even accepting Tokowitz's version of the story as true, he knew that he had not been promoted to Grade 18 by November 1998—years prior to his 2001 investigation into Kalb's behavior. He discussed the issue with both Devane and Doran in 1999, but ultimately failed to pursue the issue up the chain of command. The court sees no causal relationship between the pay grade issue and Tokowitz's protected activity. *See Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 704 (7th Cir. 2012) (noting that a causal relationship is established where the plaintiff shows her protected activity was a "substantial motivating factor" for the adverse employment action") (citation omitted).

Likewise, to the extent that Tokowitz argues that the *continued* deprivation of Grade 18 status somehow was due to his 2001 sexual harassment investigation, he has not provided evidence to support this theory. For instance, he has not argued that after 2001 he was given a new title but again deprived of a pay grade increase, nor has he indicated that he even raised the issue after 2001. And to the extent that Tokowitz intends

to point to the 1998 discussions he had with Kalb himself regarding Kalb's allegedly inappropriate behavior, this argument also falls short, as Tokowitz has not established that anyone in a position to affect Tokowitz's pay grade was aware of these conversations. In short, based on the facts of record, Tokowitz's Grade 16 salary level is not an adverse action under Title VII.

Finally, Tokowitz's responsive pleading indicates that he believes the fact that he was treated as clerk, "relieved of his duties as a supervisor," and screened off from any meaningful participation at work constitutes an adverse employment action. "For an employment action to be actionable, it must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007) (internal quotation marks and citations omitted). The Seventh Circuit has categorized adverse employment actions into three groups: those that involve "(1) the employee's current wealth such as compensation . . . [and] termination; (2) the employee's career prospects thus impacting the employee's future wealth; and (3) changes to the employee's work conditions including subjecting her to 'humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in [her] work place environment.'" *Id.* (quoting *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002)).

Tokowitz's complaints relating to his work environment fall into this third category, but the court cannot agree that the complained-of conduct is an adverse employment action. This is a highly fact-specific analysis, and the court generally would hesitate to grant summary judgment on this issue. *Compare O'Neal v. City of Chi.*, 392

F.3d 909, 913 (7th Cir. 2004) (plaintiff's complaint that her transfer deprived her of perks associated with position—including a work-provided vehicle and a particular work schedule—were unavailing, as her changed responsibilities were within the reasonable scope of her duties) *and Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998) (plaintiff who was ignored and mistreated by other employees had not suffered an adverse employment action, as there was no evidence that the employer ordered other employees to shun the plaintiff, nor was there any indication that the behavior caused material harm) *with Tart v. Ill. Power Co.*, 366 F.3d 461, 475-76 (7th Cir. 2004) (employees who were transferred to a "cold, wet, muddy trench" as a work area and lost "their computers, their independence, customer contact and their skilled job duties" had experienced an objectively and sufficiently worse condition of employment to qualify as an adverse action). Here, however, the evidence of record establishes that after the Kalb investigation, Tokowitz was not "treated as a clerk" or "relieved of his duties as a supervisor"—in fact, after the Kalb investigation Tokowitz was given a street assignment in which he supervised offenders and acted as a problem solver. Further, the evidence of record establishes that others in the department having the same or higher job titles did not always have access to an office, a computer, or a Sheriff's vehicle. Tokowitz has not pointed to evidence which would suggest that he was singled out or treated any differently based on his sexual harassment investigation. Likewise, to the extent that Tokowitz claims he was screened off from meaningful participation at work, and that inferior officers refused to follow his orders, he has not established any causal connection between his statutorily protected activity and these problems. *See Parkins*, 163 F.3d at 1039. For these reasons, the court grants the Sheriff's motion for summary judgment.

## IV. Conclusion

After analyzing the evidence presented in the light most favorable to Tokowitz, the court concludes that no genuine issue of material fact exists to warrant a trial. Because the court dismisses the federal claim, the court does not need to address whether Tokowitz's complaint is timely under the Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat 5. The court also declines to exercise supplemental jurisdiction over Tokowitz's breach of contract claim; that claim is dismissed without prejudice. *See* 28 U.S.C. § 1367(c)(3).

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 7, 2012